UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AUSTIN FREIGHT SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 4832 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| WEST WIND LOGISTICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Austin Freight Systems, Inc. ("AFS"), a shipping and logistics broker, sued West Wind Logistics, Inc., one of its carriers, in the Western District of Texas, alleging violations of the Carmack Amendment, 49 U.S.C. § 14706 *et seq.*, and state law. Doc. 1. The Texas court held that it lacked personal jurisdiction over West Wind and transferred the suit to this District. Doc. 20. AFS moves to compel arbitration. Doc. 35. The motion is denied.

**Background**

On a motion to compel arbitration, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002) (internal quotation marks omitted).

AFS routinely contracts with carriers to move shipments it has brokered. Doc. 36-13 at ¶ 4. Between 2008 and 2016, AFS engaged West Wind to move approximately seventy-two shipments. *Id*. at ¶ 8. On June 16, 2016, AFS hired West Wind to move a shipment of sausages. Doc. 1 at ¶ 6; Doc. 36-13 at ¶ 6. West Wind picked up the shipment on June 22 and dropped it off on June 25. Doc. 1 at ¶¶ 6-7. AFS alleges that the sausages were ruined in transit and that West Wind refused to assist AFS in submitting an insurance claim. *Id*. at ¶¶ 8-14.

1

In an affidavit attached to AFS's motion, AFS Chief Financial Officer George Copeland avers that AFS uses two types of contracts to manage its relationships with carriers. AFS always begins the relationship by entering into a Broker-Carrier Agreement, which governs the relationship as a whole. Doc. 36-13 at ¶ 5. The terms of each individual shipment are then set forth in a Confirmation of Verbal Rate Agreement. *Id*. at ¶ 6.

Copeland avers that a Broker-Carrier Agreement between AFS and West Wind was likely in force in June 2016; AFS was unable to find that agreement, however, probably because it was destroyed consistent with AFS's ordinary record retention practices. *Id*. at ¶ 9. AFS did locate its most recent Broker-Carrier Agreement with West Wind, which the parties executed on August 17, 2016. *Id*. at ¶ 10; Doc. 36-1. Copeland avers that the August 2016 Broker-Carrier Agreement was intended to cover all business dealings between AFS and West Wind, including shipments that took place before it was signed. Doc. 36-13 at ¶ 10. The August 2016 Broker-Carrier Agreement states: "In the event of a dispute arising out of this Agreement, including but not limited to Federal or State statutory claims, the Party's sole recourse [with minor exceptions not applicable here] shall be to arbitration." Doc. 36-1 at 3.

Also attached to AFS's motion is the Confirmation of Tariff Verbal Rate Agreement that governed the June 2016 sausage shipment. Doc. 36-2. The June 2016 Confirmation includes this provision: "This confirmation governs the movement of the above-referenced freight as of the date specified and hereby amends, is incorporated by reference and becomes a part of that certain Transportation Contract by and between 'BROKER' and 'Common Carrier.'" *Id*. at 1. Copeland avers that the phrase "that certain Transportation Contract" refers to a Broker-Carrier Agreement, though he does not specify *which* Broker-Carrier Agreement—the one that was in force in June 2016, or the one executed in August 2016. Doc. 36-13 at ¶ 7.

AFS submits that arbitration is required under the June 2016 Confirmation and the August 2016 Broker-Carrier Agreement. Doc. 35. At the motion hearing, West Wind argued that the "certain Transportation Contract" referenced in the June 2016 Confirmation was not a Broker-Carrier Agreement, but rather the Bill of Lading for the June 2016 shipment, which West Wind attached to its response to AFS's motion. Doc. 41 at 12.

## Discussion

AFS moves to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*. Doc. 36 at 2. Section 2 of the FAA states, in relevant part:

> A written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Section 2 "mandates enforcement of valid, written arbitration agreements," *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002), and "embodies both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract," *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (internal quotation marks omitted). That said, "because arbitration is a matter of contract, a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Ibid*. (internal quotation marks omitted). Accordingly, "[u]nder the FAA, arbitration should be compelled if three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017).

Courts "evaluate agreements to arbitrate under the same standards as any other contract," *Tinder*, 305 F.3d at 733, which include "all general principles of state law," *Green v. U.S. Cash Advance Ill., LLC*, 724 F.3d 787, 791 (7th Cir. 2013); *see also Gore*, 666 F.3d at 1032 ("[C]ourts

3

must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms.") (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)); *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011) ("Whether the parties have validly agreed to arbitrate is governed by state-law principles of contract formation."); *Zurich Am. Ins. Co. v. Watts Indus.*, 466 F.3d 577, 580 (7th Cir. 2006) (same); *Stone v. Doerge*, 328 F.3d 343, 345 (7th Cir. 2003) ("[M]ost interpretive disputes [concerning the scope of an arbitration clause] must be resolved under state law."). AFS argues, and West Wind does not dispute, that Texas law governs. Doc. 36 at 6.

Texas law requires the court "to ascertain the parties' true intent as expressed by the [contract's] plain language." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). "Only where a contract is ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument." *TRO-X, LP v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 466 (Tex. 2018) (internal quotation marks omitted). When "determin[ing] whether a contract's arbitration clause applies to a given dispute, federal courts apply state-law principles of contract formation," but "[o]nce it is clear … that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Gore*, 666 F.3d at 1032. Accordingly, "a court may not deny a party's request to arbitrate an issue unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Ibid*. (internal quotation marks omitted); *see also Am. Int'l Specialty Lines Ins. Co. v. Elec. Data Sys. Corp.*, 347 F.3d 665, 671 (7th Cir. 2003) ("A trial to determine arbitrability is required … only if the issue that an evidentiary hearing would resolve is fairly contestable.").

West Wind does not dispute that the August 2016 Broker-Carrier Agreement's arbitration clause is a valid, written arbitration agreement or that it governs at least some disputes between West Wind and AFS. Rather, West Wind argues that disputes concerning the June 2016 sausage shipment do not fall within the clause's scope. Doc. 41 at 3-5. The parties' arguments on that issue raise three questions. First, is "that certain Transportation Contract" referenced in the June 2016 Confirmation a Broker-Carrier Agreement or a Bill of Lading? Second, assuming that "that certain Transportation Contract" is a Broker-Carrier Agreement, is it the August 2016 Broker-Carrier Agreement or the Broker-Carrier Agreement that was in force in June 2016? Third, even if the June 2016 Confirmation did not incorporate an agreement to arbitrate, did the parties later agree in the August 2016 Broker-Carrier Agreement to arbitrate disputes arising out of past shipments like the June 2016 sausage shipment?

The court can resolve AFS's motion without answering the first question, because even if the phrase "that certain Transportation Contract" in the June 2016 Confirmation refers to a Broker-Carrier Agreement, it is the Broker-Carrier Agreement that was in force in June 2016, not the August 2016 Broker-Carrier Agreement. AFS's argument that the June 2016 Confirmation incorporated the August 2016 Broker-Carrier Agreement, Doc. 36 at 8, cannot be reconciled with the Confirmation's text. The phrase "*that certain* Transportation Contract," Doc. 36-2 at 1 (emphasis added), plainly indicates that the parties had a *particular* contract in mind, and therefore that they intended to refer to a definite, existing contract, not some possible, future contract; it would be odd, to say the least, to refer to a possible, future contract as "that certain" contract. *See URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018) ("[O]ur quest [when interpreting contracts] is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.").

Even if the June 2016 Confirmation were ambiguous on that point, extrinsic evidence confirms that the June 2016 Confirmation does not refer to the August 2016 Broker-Carrier Agreement. *See TRO-X*, 548 S.W.3d at 466. AFS submits unrebutted evidence that *some* Broker-Carrier Agreement was already in force at the time the parties executed the June 2016 Confirmation. Doc. 36-13 at ¶¶ 5, 9. But neither party submits any evidence suggesting that they had planned, discussed, or even conceived of the August 2016 Broker-Carrier Agreement at the time they executed the June 2016 Confirmation. Thus, while the record supports the proposition that the parties intended in the June 2016 Confirmation to refer to *a* Broker-Carrier Agreement, it does not support the proposition that the parties had conceived of, much less intended to refer to, the *August 2016* Broker-Carrier Agreement.

On this record, then, it is beyond dispute that if the phrase "that certain Transportation Agreement" in the June 2016 Confirmation in fact refers to a Broker-Carrier Agreement, it refers to the Broker-Carrier Agreement that was in force when the Confirmation was signed. AFS submits no evidence that the Broker-Carrier Agreement in force in June 2016 contained an arbitration clause of any kind. Accordingly, there is no basis in the record to hold that the June 2016 Confirmation incorporated by reference an agreement to arbitrate this dispute.

That leaves the question whether the parties agreed in the August 2016 Broker-Carrier Agreement to arbitrate disputes arising out of past shipments. The text of the August 2016 Broker-Carrier Agreement's arbitration clause shows that the parties reached no such agreement.

Granted, as AFS observes, certain arbitration clauses have been interpreted to apply to disputes concerning prior business dealings. Doc. 36 at 8 n.4 (citing *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 332 (10th Cir. 1993); *Freund v. UBS Fin. Servs., Inc.*, 141 F. Supp. 3d 797, 807, 809 (N.D. Ill. 2015); *Norton v. Tucker Entm't, LLC*, 2014 WL

5023654, at *1-*2 (N.D. Tex. Oct. 8, 2014); *Ben. Nat'l Bank v. Payton*, 214 F. Supp. 2d 679, 688-89 (S.D. Miss. 2001)). But the parties in those cases expressly agreed to arbitrate either all claims arising out of their commercial relationship or all claims between them no matter when the claims arose. *See Zink*, 13 F.3d at 332 (emphasizing that the parties agreed to arbitrate "any controversy between the parties arising out of plaintiff's business *or* this agreement," and concluding that this language was broad enough to "cover more than just those matters set forth in the contract") (alteration and brackets omitted); *Freund*, 141 F. Supp. 3d at 807 (same, where the parties agreed to arbitrate "any dispute, claim or controversy that may arise between Plaintiff and his customer, or any other person, that is required to be arbitrated under FINRA's rules") (internal quotation marks omitted); *Norton*, 2014 WL 5023654, at *1-*2 (holding that because the parties used "retroactive language" in agreeing to arbitrate "any disputes that may have arisen at any time during the relationship between the parties," the arbitration clause "appl[ied] to controversies preceding its existence"); *Ben. Nat. Bank*, 214 F. Supp. 2d at 688-89 (holding that an arbitration provision can be applied retroactively if it includes "retroactive time-specific language, e.g., … 'this agreement applies to all transactions occurring before or after this agreement'" or "contains language stating that it applies to 'all transactions between us' or 'all business with us'").

By contrast to the arbitration clauses in those cases, the August 2016 Broker-Carrier Agreement's arbitration clause is expressly limited to disputes arising out of that Agreement: "In the event of a dispute *arising out of this Agreement* … the Party's sole recourse … shall be arbitration." Doc. 36-1 at 3. That limitation is significant, as "[c]ourts construing arbitration clauses have refused to subject claims to arbitration where the claims arise from or relate to conduct occurring prior to the effective date of the agreement, *and* where the clause is limited to

7

claims under '*this* Agreement.'" *TradeComet.com LLC v. Google, Inc.*, 435 F. App'x 31, 34 (2d Cir. 2011) (collecting cases); *see also Atencio v. Tunecore, Inc.*, __ F. App'x __, 2019 WL 1858376, at *1 (9th Cir. Apr. 25, 2019) (holding that an arbitration clause "limited to those controversies 'relating to *this* Option Agreement'" did not apply retroactively to disputes concerning matters that occurred prior to the agreement's execution); *Carter v. Doll House II, Inc.*, 608 F. App'x 903, 904 (11th Cir. 2015) (holding that an arbitration clause did not apply retroactively because it "clearly refers 'only' to 'any dispute regarding this contract/agreement'"); *Thomas v. Carnival Corp.*, 573 F.3d 1113, 1117 (11th Cir. 2009) (holding that an arbitration clause limited to "[a]ny and all disputes arising out of or in connection with this Agreement" was not retroactive and did not make arbitrable claims arising out of prior agreements) (emphasis omitted), *abrogated on other grounds as recognized in Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1278 (11th Cir. 2011); *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) (similar); *cf. Kristian v. Comcast Corp.*, 446 F.3d 25, 33 (1st Cir. 2006) (holding that an arbitration clause applied retroactively because it was not limited to "disputes that … arise 'out of this agreement' and hence [was] not limited by the time frame of the agreement[ ]"). The reasoning in those cases is simple: A dispute cannot "arise out of" a contract if the contract did not exist when the disputed matter occurred. Here, the disputed sausage shipment occurred in June 2016, before the parties signed the August 2016 Broker-Carrier Agreement. Claims related to that shipment therefore did not "aris[e] out of [the August 2016 Broker-Carrier] Agreement," Doc. 36-1 at 3, and accordingly do not fall within the scope of that Agreement's arbitration clause.

AFS retorts that its claims arise in part from West Wind's alleged refusal to cooperate with AFS's efforts to submit an insurance claim, which occurred after the parties signed the

August 2016 Broker-Carrier Agreement. Doc. 36 at 8 n.4. But the arbitration clause does not apply to any and all disputes that arose after the Agreement was signed. Rather, it applies only to claims *arising out of* the Agreement. *See Thomas*, 573 F.3d at 1118 ("[T]he relevant question is whether [the claims at issue] arose 'out of or in connection with this … Agreement,' as set forth in the Arbitration Clause. It is not enough that the dispute simply arose from [the plaintiff's] work [for the defendant], *or arose after the … Agreement was signed, for that matter*. The disputes must have some actual relation to the … Agreement … .") (emphasis added). AFS does not point to any provision in the Agreement that obligates West Wind to assist AFS in its attempts to secure insurance payouts based on *any* shipments, let alone shipments pre-dating the Agreement, and it is not the court's role to scour the Agreement looking for such a provision. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel … .") (internal quotation marks and brackets omitted).

Finally, AFS urges the court to find based on Copeland's affidavit that the August 2016 Broker-Carrier Agreement applies to the parties' entire commercial relationship, including events that occurred before the agreement was signed. Doc. 36 at 8; Doc. 43 at 2. This argument fails. A contract's text trumps a party's beliefs concerning the parties' intent. *See Great Am. Ins. Co.*, 512 S.W.3d at 893 ("A contract's plain language controls, not what one side or the other alleges they intended to say but did not."). Moreover, extrinsic evidence like Copeland's affidavit is not admissible to prove the meaning of a contract unless the contract is

9

ambiguous. *See TRO-X*, 548 S.W.3d at 466. Here, the August 2016 Broker-Carrier Agreement is unambiguous: It confines the universe of arbitrable claims to those "arising out of" that agreement. Doc. 36-1 at 3. Copeland's contrary averments about the intended scope of the clause therefore have no value.

**Conclusion**

AFS's motion to compel arbitration is denied.

May 13, 2019

Gary Feinerman
United States District Judge